(252 P.3d 586)
No. 101,611

STATE OF KANSAS, *Appellee*, v. LEON MITCHELL, III, *Appellant*.

Opinion filed April 8, 2011.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, for appellee.

Before GREENE, C.J., BUSER and ATCHESON, JJ.

GREENE, C.J.: Leon Mitchell, III, appeals his convictions and sentences for aggravated burglary and attempted aggravated robbery, arguing that the district court abused its discretion in denying his motion for mistrial due to juror misconduct, erred in denying his *Batson* challenge, erred in giving the jury an *Allen*-type instruction, and violated his due process rights at sentencing by conducting independent online research. Mitchell also argues cumulative error. Mitchell finally argues that the district court violated his Sixth and Fourteenth Amendment rights by enhancing his sen-

tences without requiring either the aggravating factors or his criminal history score to be proven to a jury beyond a reasonable doubt.

## FACTUAL AND PROCEDURAL BACKGROUND

After Mitchell came to Wanda Markham's home looking for her boyfriend, Andre Leon Williams, Mitchell returned the same day while Markham was on the phone with Williams. Markham testified that she heard the screen door open and looked around and saw Mitchell in the house. Markham screamed at Mitchell to get out of her house. Mitchell pulled a gun out of a white Wal-Mart sack, cocked it, and said he was going to "merk" Markham and her daughter, Loni. Loni started crying and screaming and attempted to leave the house through the back door when she saw the gun. Mitchell pointed the gun at Loni and told Markham to tell her daughter to "shut up and get back in here or I'm gonna merk her." Markham told Loni to go into Markham's mother's room, close the door, and lock it.

According to Markham, Mitchell then told her that he was there to get drugs that Williams had stolen from Mitchell's cousin, and he demanded money as well. Mitchell told her that he would kill her if she did not give him the drugs and the money. Mitchell became nervous and left the house after Williams' mother arrived and called 911.

Mitchell was charged with aggravated burglary and attempted aggravated robbery. He was found guilty as charged by a jury and sentenced to 136 months' imprisonment for the aggravated burglary and 34 months for the attempted aggravated robbery, with the sentences to run consecutively.

Mitchell appeals both his convictions and his sentences.

## DID THE DISTRICT COURT ABUSE ITS DISCRETION IN DENYING MITCHELL'S MOTION FOR MISTRIAL DUE TO JUROR MISCONDUCT?

At the start of the second day of trial, outside of the presence of the jury, Mitchell's counsel asked for a mistrial based on juror misconduct because he was "led to believe" that juror number one was text messaging during the trial. The court noted that "led to

believe is something different from any observation of" the juror actually text messaging and asked defense counsel if he had any direct evidence that the juror was texting. Defense counsel stated that he observed the juror slumped down in her seat below the rail in front of the jury box, but that he did not know what she was doing. He said he moved for a mistrial "grudgingly, because [he] favored this jury" and that he was "satisfied with the other jurors," who had "been attentive and participated fully in the case."

The prosecutor stated that she did not notice the juror texting, but that she did not look at the jury during trial. She added, "So I don't know if you want to bring her out here and ask her or what." The judge noted that his bailiff had advised him that juror number one was texting during jury selection, and that he had noticed the juror's hands were below the rail and that her focus was down towards her lap during the first day of the trial, although the judge could not see if the juror was text messaging.

The court denied the motion for mistrial but admonished all the jurors collectively to make sure their cell phones were turned off, not just set to vibrate. On appeal, Mitchell argues that the district court should have granted his motion for mistrial.

Applicable standards of review have been stated by our Supreme Court. "Communication between jurors and third parties is broadly termed juror misconduct." *State v. Overton*, 279 Kan. 547, 557, 112 P.3d 244 (2005). Under K.S.A. 22-3423(1)(c), a district court may order a mistrial at any time if prejudicial conduct, inside or outside the courtroom, makes it impossible to proceed without injustice to either party. Juror misconduct will not be a ground for mistrial, however, unless the party claiming error shows that such error substantially prejudiced his or her rights. *State v. Wimbley*, 271 Kan. 843, 852, 26 P.3d 657 (2001). A motion for mistrial is reviewed under an abuse of discretion standard, and the party alleging the abuse bears the burden of proving that his or her rights to a fair trial were prejudiced. *State v. McReynolds*, 288 Kan. 318, 329, 202 P.3d 658 (2009).

"A high degree of appellate deference is allowed a trial judge's exercise of discretion in assessing the texture and feel of the trial, the credibility of witnesses, and the perceived impact of an allegedly prejudicial event. In these circumstances,

appellate decisions often recognize a presumption of validity in the exercise of discretion because of the superior vantage point of the trial judge. The judge's decision will be affirmed even though the appellate tribunal might otherwise be inclined to take a precisely opposite view of the matter." *Saucedo v. Winger*, 252 Kan. 718, 731, 850 P.2d 908 (1993).

With regard to unauthorized juror communication, whether electronic or otherwise, our appellate courts have held that "[i]t is the usual practice to question the juror involved in complaints alleging misconduct," but the trial court was within its discretion to deny a mistrial where the complaining party failed to request an interview of the juror or otherwise meet his or her burden of proving juror misconduct. *State v. Macomber*, 244 Kan. 396, 407-08, 769 P.2d 621, *cert. denied* 493 U.S. 842 (1989), *overruled on other grounds by State v. Rinck*, 260 Kan. 634, 923 P.2d 67 (1996). Our Supreme Court has also held that even where the trial court denies such a request, prejudice will not be presumed where the complaining party failed to pursue his or her claim by utilizing the posttrial procedure to recall the juror or jurors and question them pursuant to K.S.A. 60-441. *State v. Fulton*, 269 Kan. 835, 844, 9 P.3d 18 (2000).

Here, Mitchell failed to request any inquiry into the alleged misconduct and failed to utilize any posttrial procedure to investigate the matter. Although it may have been the better practice for the trial court to have made the inquiries, we are unable to conclude that no reasonable person would take the view adopted by the district court. See *State v. Moses*, 280 Kan. 939, 945, 127 P.3d 330 (2006). The trial court did not abuse its discretion in denying Mitchell's motion for a mistrial on the basis of juror misconduct.

We agree with the Indiana Supreme Court that the best practice is to prohibit such use of electronic devices by jurors.

"We additionally observe that permitting jurors, other trial participants, and observers to retain or access mobile telephones or other electronic communication devices, while undoubtedly often helpful and convenient, is fraught with significant potential problems impacting the fair administration of justice. These include the disclosure of confidential proceedings or deliberations; a juror's receiving improper information or otherwise being influenced; and a witness's or juror's distraction or preoccupation with family, employment, school, or business concerns. These and other detrimental factors are magnified due to swift advances in tech-

nology that may enable a cell phone user to engage in text messaging, social networking, web access, voice recording, and photo and video camera capabilities, among others. The best practice is for trial courts to discourage, restrict, prohibit, or prevent access to mobile electronic communication devices by all persons except officers of the court during all trial proceedings, *and particularly by jurors during jury deliberation.*" (Emphasis added.) *Henri v. Curto*, 908 N.E.2d 196, 202-03 (Ind. 2009).

We encourage our PIK committee to consider a revision to the general instruction on juror communication along the lines of that utilized in New York:

" 'Jury Admonitions in Preliminary Instructions' to include specific instructions to jurors not to use 'internet maps or Google Earth' as well as not to actually visit any place mentioned during the trial, not to use 'the internet' to do any research about the case, and not to use 'text messages, email, internet chat rooms, blogs or social websites, such as Facebook, MySpace, or Twitter' as well as face-to-face conversations to discuss the case." *People v. Jamison*, No. 8042/06, 2009 WL 2568740 (N.Y. Sup. Ct., Misc. 3d 2009) (unpublished opinion).

## DID THE DISTRICT COURT ERR IN DENYING MITCHELL'S *BATSON* CHALLENGE?

Mitchell argues that the district court erred in denying his challenge to the State's peremptory strike of an African-American juror under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

At Mitchell's trial, three African-Americans were present for jury selection. X.H., an African-American potential juror was excused by agreement because of her age. F.A., an African-American, was selected to be on the jury. During jury selection, the prosecutor, C.J. Rieg, asked if any of the potential jurors knew anyone that was or had been in prison. After the third African-American, R.A., answered that she had a cousin in jail, Rieg asked her if this would affect her ability to be fair and impartial, and R.A. replied, "Not sure." R.A. stated that Mitchell was a black man and that she thinks the system is sometimes unfair. The following exchange then occurred:

"MS. RIEG: Okay. Do you think you can be fair and impartial to the State and to the defendant in this particular case?

"[R.A.]: I think I'm a trustworthy and honest person, so I would have to say yes. I think I may dissect the evidence a lot more than maybe just an average person.

"MS. RIEG: To convince yourself more that of guilt—

"[R.A.]: Guilty or not guilty, correct.

"MS. RIEG: The bottom line is will you hold the State to a higher standard?

"[R.A.]: When you say higher standard, higher than what?

"[R.A.]: [The transcript indicates R.A. was speaking, but it appears that it was the prosecutor]: Beyond a reasonable doubt.

"[R.A.]: Yes.

"MS. RIEG: Thank you for your honesty, I appreciate it."

The State challenged R.A. for cause, stating, "[B]because she will hold me to a higher standard than beyond a reasonable doubt." The State noted that it did not object to R.A.'s statement that she would scrutinize the evidence. The district court gave Mitchell's counsel, Randall Price, the chance to rehabilitate R.A. The following conversation occurred:

"MR. PRICE: . . . [R.A.], I'm not clear about your answer. You indicated that, in response to a question from Ms. Rieg, that if you were asked to decide this case and were asked to find that the State was required to prove guilt beyond a reasonable doubt, you would hold the State to a higher standard?

"[R.A.]: I don't think I said that.

"MR. PRICE: Okay, I didn't think you did, either, but I just want to make sure that we were clear about your answer real quickly. Have you formed an opinion about whether or not Mr. Mitchell is guilty or not guilty?

"[R.A.]: No, I have not.

"MR. PRICE: Will you agree that you should follow the judge's instructions as given?

"[R.A.]: Of course.

"MR. PRICE: And do you feel that you can act impartially and without prejudice?

"[R.A.]: Yes."

The district court then had the following conversation with R.A.:

"THE COURT: . . . The question, [R.A.] is whether or not you would hold the State to the standard they're required to prove, that is proof beyond a reasonable doubt and not any higher standard?

"[R.A.]: Correct

"THE COURT: You could do that?

"[R.A.]: Yes.

"THE COURT: Okay, Well I will not honor the for cause challenge on that—on [R.A.]"

Thereafter, the parties exercised their peremptory challenges, and Rieg used a challenge on R.A. Price indicated that he wished to make a *Batson* challenge. The jury was excused, and the court asked to hear from counsel on the *Batson* issue. The following exchange occurred:

"MS. RIEG: Judge, I requested of Ms. Miles to pull just the questioning by me of [R.A.], because when she was talking to Mr. Price that just was not my recollection of what she said. And this transcript—this is what I recall her saying, that she—I think I may dissect the evidence a lot more than maybe just an average person. And the dissection of evidence doesn't give me concern; however, I'm a little concerned that she thinks she's—I don't know, different than an average person.

"But what really concerns me is that I asked her, the bottom line is will you hold the State to a higher standard. And she responded, when you say higher standard, higher than what? Beyond a reasonable doubt. Yes. Okay. Thank you. So and the way it—with her tone and everything, I took it to be that she would hold me to a higher standard than beyond a reasonable doubt is the way the colloquy, the flow of it went, that—

"THE COURT: Well, this transcript, of course, does speak for itself. Following this exchange with [R.A.] there were some additional questions asked by Mr. Price and by the Court and I don't have the transcript of that, but I do recall that she was asked if she understood what the beyond a reasonable doubt standard was. I told the jury as a whole that there was no legal definition that I could give them. And she did indicate that she would follow the beyond a reasonable doubt standard.

"MS. RIEG: Correct.

"THE COURT: So how do you—what additional argument do you have in conjunction or in relation to the rehabilitation that was done in the manner that I've just described?

"MS. RIEG: Well, she said she could follow the law, but when we were—when we were talking, just this, in conjunction with her saying that she would hold me to the higher standard and she'd do a lot more than the average person, that just gives me concern."

Our Supreme Court recently outlined the three distinct steps of analysis and the standard of review to be applied to each step of a *Batson* challenge:

"In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court held that the Equal Protection Clause of the

Fourteenth Amendment prohibits the use of peremptory challenges to strike potential jurors on the basis of race. Analysis of a *Batson* challenge, such as that pursued by [the defendant] here, involves three distinct steps, with different standards of review applied to each step. See *State v. Angelo*, 287 Kan. 262, 272, 197 P.3d 337 (2008) (discussing *State v. Pham*, 281 Kan. 1227, 1237, 136 P.3d 919 [2006]).

"The first step in the *Batson* analysis requires that a defendant make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Appellate review of the district judge's decision on this step is plenary. *Angelo*, 287 Kan. at 271.

"Second, once a defendant makes a prima facie showing, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the prospective juror. The prosecutor's burden is one of production, not persuasion. Thus the explanation does not have to be persuasive, or even plausible; it need only be facially valid. Unless discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Angelo*, 287 Kan. at 271. '[T]he ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike.' *Angelo*, 287 Kan. at 272.

"Third, the district judge determines the ultimate question—whether the defendant has carried his or her burden of proving purposeful discrimination. 287 Kan. at 272 (quoting *Pham*, 281 Kan. at 1237). The decision on this step hinges on credibility determinations and is reviewed for abuse of discretion. See *Pham*, 281 Kan. at 1237, (quoting *Hernandez v. New York*, 500 U.S. 352, 364-65, 114 L. Ed. 2d 395, 111 S. Ct. 1859 [1991]) (Decisive question in typical peremptory challenge inquiry whether counsel's race-neutral explanation should be believed; seldom much evidence bearing on issue; best evidence often demeanor of attorney exercising challenge; evaluation of such demeanor 'peculiarly within a trial judge's province'); compare *Thaler v. Haynes*, 559 U.S. 43, 175 L. Ed. 2d 1003, 130 S. Ct. 1171 (2010) (when demeanor of venire member placed in issue by *Batson* challenge, ruling judge need not have observed or remember venire member's demeanor)." *State v. Hill*, 290 Kan. 339, 358-59, 228 P.3d 1027 (2010).

Mitchell's challenge on appeal focuses on the third step of the analysis, the credibility of the State's proffered explanation for striking R.A. First, Mitchell argues that the State struck R.A. because of a fear that she would hold the State to a higher standard and this was purposeful discrimination because "defense counsel, with the court's assistance had clearly rehabilitated R.A." We recognize that there was some rehabilitation of R.A. on this issue and that the court ultimately denied a challenge for cause on this issue. Neither this rehabilitation nor the denial of a for cause challenge, however, is definitive on a *Batson* challenge. Our Supreme Court

has been clear in holding that a survival of a challenge for cause does not make the juror immune to peremptory strike:

"It does not follow, however, that [the prospective juror's] survival of a challenge for cause made her immune to peremptory strike. The rejection of the State's challenge for cause does not mean that it could not employ similar reasoning as a basis for a legitimate peremptory challenge. To be valid under *Batson*, the prosecutor's 'explanation need not rise to the level justifying exercise of a challenge for cause.' *Batson*, 476 U.S. at 97. Moreover, the purpose of a peremptory challenge is to strike prospective jurors not subject to challenge for cause but who are believed to be 'inclined against' a party's interests. *Morrison v. State*, 818 So. 2d 432, 443-44 (Fla. 2002) (quoting *Holland v. Illinois*, 493 U.S. 474, 480, 107 L. Ed. 2d 905, 110 S. Ct. 803 [1990]) (not improper for State to ' "exercise its peremptory challenges to strike prospective jurors who are opposed to the death penalty, but not subject to challenge for cause" ')." *Hill*, 290 Kan. at 359-60.

Second, Mitchell argues that the alternative reason stated as a basis for peremptory strike was that R.A. said "she'd do a lot more than the average person" in reviewing the evidence. Although the prosecutor told the court during voir dire that she "was not objecting to the scrutinizing the evidence," R.A.'s statement was made in the context of her other statement about holding the State to a higher burden, so we understand it as heightening the concern about R.A.'s willingness to accept and follow instructions on burden of proof.

Examining both of the stated reasons for the peremptory challenge, we conclude that there is no discriminatory intent in either of these explanations. Accordingly, we must deem the reasons to be race-neutral. See *Hill*, 290 Kan. at 358.

Two additional factors suggest no abuse of discretion. As noted by the State, the prosecution also noted R.A.'s tone. Our Supreme Court has recognized that although the trial court must be cautious in using body language, including tone of voice as the sole reason for striking a juror, tone of voice " 'is a matter which the trial court may take into consideration in determining whether the prosecutor has a valid and neutral reason for striking the juror.' " *Pham*, 281 Kan. at 1238-39 (quoting *State v. Hood*, 245 Kan. 367, 374, 780 P.2d 160 [1989]).

Finally, our Supreme Court has noted that "[o]ne factor to consider in determining whether the State's peremptory challenges are discriminatory is the presence of other members of the same minority on the jury and the failure of the State to remove such members when given the opportunity." *State v. Trotter*, 280 Kan. 800, 812, 127 P.2d 972 (2006). Here, three African-Americans were present for jury selection. X.H., a potential African-American juror was excused because of her age. F.A., an African-American, was selected to be on the jury. The district court noted in its decision that its analysis would have been different if the prosecutor had struck both F.A. and R.A. and further noted that X.H. was excused with the concurrence of the parties.

Mitchell fails to show that the district court abused its discretion in determining that the State's strike of R.A. was constitutionally permissible.

### Did the District Court Commit Reversible Error in Giving an *Allen* Instruction in the General Predeliberation Instructions?

Mitchell challenges the language found in Jury Instruction No. 2, an *Allen*-type instruction. See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). The instruction stated, in pertinent part:

"Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge(s) to a different jury at a later time. *Another trial would be a burden on both sides.*" (Emphasis added.)

The challenged language came from the outdated 2004 version of PIK Crim. 3d 68.12, commonly known as the "deadlocked jury" instruction. See PIK Crim. 3d 68.12 (2009 Supp.) (revised).

Counsel for Mitchell did not object to the issuance of the instruction. "An appellate court reviewing a district court's giving or failure to give a particular instruction applies a clearly erroneous standard where a party neither suggesting an instruction nor objected to its omission." *State v. Martinez*, 288 Kan. 443, 451, 204 P.3d 601 (2009); see K.S.A. 22-3414(3).

In *State v. Salts*, 288 Kan. 263, Syl. ¶ 2, 200 P.3d 464 (2009), our Supreme Court held that "[i]nclusion of the language '[a]nother trial would be a burden on both sides' in PIK Crim. 3d 68.12 is error." The court found, however, that under the clearly erroneous standard of review, the error was not reversible. 288 Kan. at 267. The court also noted, when discussing other portions of PIK Crim. 3d 68.12, "our criticisms of other language found in PIK Crim. 3d 68.12 have never led to reversal of a conviction when the instruction was given before jury deliberations began." 288 Kan. at 266. In this case, the instruction was given before jury deliberations began.

Mitchell provides no argument for why his case is distinguishable from the result in *Salts*. Because there was not a real possibility that the jury would have rendered a different verdict had the error not occurred, the district court's inclusion of the *Allen*-type jury instruction in the original instruction set was not clearly erroneous.

## DID CUMULATIVE ERROR SUBSTANTIALLY PREJUDICE MITCHELL AND DENY HIM A FAIR TRIAL?

Mitchell argues that even if he has not raised one issue that requires reversal alone, the cumulative effect of the trial court's error requires reversal.

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. [Citation omitted.]" *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

As discussed above, the district court committed a nonreversible error involving inclusion of an outdated *Allen*-type jury instruction, which was not clearly erroneous. Our Supreme Court has noted, however, that "[o]ne error is insufficient to support reversal under the cumulative effect rule. [Citation omitted.]" *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009); see also *State v. Ellmaker*, 289 Kan. 1132, 1156-57, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010) (refusing to apply cumulative error doctrine when a deadlocked jury instruction was the only trial error).

We have rejected other claims of error, so we must conclude there is no basis to reverse Mitchell's convictions under the cumulative effect rule.

DOES THIS COURT HAVE JURISDICTION TO CONSIDER MITCHELL'S CONSTITUTIONAL CHALLENGES TO HIS SENTENCES?

The district court found Mitchell's criminal history category was A. Mitchell's aggravated burglary was a severity level 5 nondrug person felony, which subjected him to prison with a low sentence of 122 months, a standard sentence of 130 months, or a high sentence of 136 months. The district court imposed the high sentence of 136 months. Mitchell's attempted aggravated robbery was a severity level 5 nondrug person felony, which subjected him to a low sentence of 31 months, a standard sentence of 32 months, or a high sentence of 34 months. The district court imposed the high sentence of 34 months, to run consecutive to his aggravated robbery conviction.

Mitchell raises two constitutional challenges to his presumptive sentence.

A. *Due process challenge to the Judge's use of information contained within the Kansas Department of Corrections' website*

For the first time on appeal, Mitchell argues that the sentencing court violated his due process rights by basing his sentence, in part, on information contained within the Kansas Department of Corrections' (KDOC) website.

The State argues two grounds on which defendant's constitutional challenge to his sentence is not properly before this court. First, the State argues that the Court of Appeals has stated that constitutional challenges to a presumptive guidelines sentence are not cognizable on direct appeal, citing *State v. Lewis*, 27 Kan. App. 2d 134, 140-42, 998 P.2d 1141, *rev. denied* 269 Kan. 938 (2000). Second, constitutional issues raised for the first time on appeal are not properly before the reviewing court, citing *State v. Shears*, 260 Kan. 823, Syl. ¶ 8, 925 P.2d 1136 (1996).

Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Ellmaker*, 289 Kan. at 1147.

The right to appeal is entirely statutory and is not contained in the United States or Kansas Constitutions. Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by statutes. See 289 Kan. at 1148. An appellate court has a duty to question jurisdiction on its own initiative. When the record discloses a lack of jurisdiction, it is the duty of the appellate court to dismiss the appeal. *State v. Gill*, 287 Kan. 289, 294, 196 P.3d 369 (2008).

Because Mitchell received a sentence within a grid box, it is a presumptive sentence under K.S.A. 21-4704(f) and K.S.A. 21-4721(c)(1) precludes our jurisdiction to review the presumptive sentence. Although Mitchell argues his sentence violated constitutional due process, Kansas appellate courts have held that most constitutional challenges to a presumptive sentence may not be considered in a direct appeal. *State v. Huerta*, 291 Kan. 831, Syl. ¶ 3, 247 P.3d 1043 (2011) (argument that presumptive sentence has a constitutionally based infirmity not reviewable on direct appeal); *State v. Clemons*, 273 Kan. 328, 343-44, 45 P.3d 384 (2002) (discussing cruel and unusual punishment argument); *State v. Bramlett*, 273 Kan. 67, Syl., 41 P.3d 796 (2002) (imposition of consecutive sentences does not violate *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 [2000]; court without jurisdiction to review presumptive sentences); *Lewis*, 27 Kan. App. 2d at 140-42 (finding that there was no jurisdiction to review defendant's cruel and unusual punishment argument and framing the question as "whether the court could reach a constitutional challenge to a presumptive sentence"); *State v. Smotherman*, No. 93,685, unpublished opinion filed December 2, 2005 (finding that the procedural bar does not recognize an exception when due process rights are violated). The issue Mitchell presents is plainly one beyond this court's jurisdiction on a direct appeal.

B. *Sixth and Fourteenth Amendment challenge to high number in applicable sentencing grid box*

Secondly, Mitchell argues that because the aggravating factors were not charged in the complaint, put before a jury, and proven

beyond a reasonable doubt to a jury, the aggravated sentence imposed by the district court was a violation of his Sixth and Fourteenth Amendment rights, relying on *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007).

This issue was directly addressed by our Supreme Court in *Johnson*, 286 Kan. 824, Syl. ¶¶ 5-6, where the court found that because the Kansas Sentencing Guidelines Act provides the trial court with discretion to impose any sentence within the presumptive range, the prescribed statutory maximum sentence under *Cunningham* is the higher number in the applicable sentencing grid box. Therefore, a sentence to any term, including an aggravated term, within the range in a Kansas sentencing guidelines presumptive grid box does not violate *Cunningham* or *Apprendi. Johnson*, 286 Kan. at 851. Moreover, because a sentence that falls within a grid box is a presumptive sentence, appellate courts lack jurisdiction to consider a challenge to such sentence under K.S.A. 21-4721(c). Appellate courts lack jurisdiction even if the sentence is to the longest terms in the presumptive grid box for a defendant's convictions. 286 Kan. at 851-52; see *State v. Schad*, 41 Kan. App. 2d 805, 831, 206 P.3d 22 (2009).

Mitchell acknowledges that this issue was decided in *Johnson* but includes the issue to exhaust his state court remedies. Because the Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position, *Johnson* controls this issue and we must affirm the district court's decision regarding the aggravated sentence imposition.

### DID THE DISTRICT COURT VIOLATE MITCHELL'S CONSTITUTIONAL RIGHTS UNDER *APPRENDI*?

As a preliminary matter, the State argues that this court lacks jurisdiction to review Mitchell's arguments regarding the use of his criminal history score to enhance his sentence. Our Supreme Court, however, has found that even when the defendant did not object to his or her criminal history score in the trial court, " 'an appellate court may review a claim that the sentencing court erroneously included recognition of a prior conviction notwithstand-

ing the defendant's failure to object to his or her criminal history score.'" *State v. Fischer*, 288 Kan. 470, 471, 203 P.3d 1269 (2009) (quoting *State v. Pennington*, 276 Kan. 841, 851, 80 P.3d 44 [2003]). Therefore, this court has authority to hear Mitchell's argument that the district court erred by sentencing him to a higher sentence based on his criminal history score.

Proceeding to the merits, our Supreme Court has rejected Mitchell's argument, finding that "*Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), does not apply where the sentence imposed was based in part upon a defendant's criminal history score under K.S.A. 2001 Supp. 21-4704 of the Kansas Sentencing Guidelines Act." *State v. Ivory*, 273 Kan. 44, Syl. ¶ 1, 41 P.3d 781 (2002). In *Ivory*, the defendant argued "(1) the sentencing court increased his sentence by using prior convictions, (2) the convictions were neither included in his complaint nor presented to a jury and proven beyond a reasonable doubt; and (3) prior criminal history should not be included in calculating his sentence." 273 Kan. at 45.

Reviewing Mitchell's argument de novo, because the Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position, *Ivory* controls this issue, and we must affirm the district court's decision. The Supreme Court reaffirmed *Ivory* in 2009 and, therefore, this court is duty bound to follow *Ivory*. See *State v. Brinklow*, 288 Kan. 39, 54-55, 200 P.3d 1225 (2009). Mitchell acknowledges that *Ivory* controls but includes the issue to exhaust his state court remedies.

Affirmed.